Ahilan T. Arulanantham, SBN 237841
aarulanantham@aclusocal.org
Zoë N. McKinney, SBN 312877
zmckinney@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5211/Fax: (213) 977-5297

Jessica Karp Bansal, SBN 277347
jbansal@ndlon.org
Emilou MacLean, SBN 319071
emi@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
674 S. La Fayette Park Place
Los Angeles, CA 90057
Telephone: (213) 380-2214/Fax: (213) 380-2787

Alycia A. Degen, SBN 211350
adegen@sidley.com
Sean A. Commons, SBN 217603
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000/Fax: (213) 896-6600

Attorneys for Plaintiffs
[*Additional Counsel Listed on Next Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KESHAV BHATTARAI; SAJJAN PANDEY; SUMNIMA THAPA; DONALDO POSADAS CACERES; SORAYDA RODRIGUEZ MOTIÑO; DENIS MOLINA CHAVEZ; S.S., individually and on behalf of others similarly situated; and G.D.P., individually and on behalf of others similarly situated.<br><br>Plaintiffs,<br><br>vs.<br><br>KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security; ELAINE C. DUKE, in her official capacity as Deputy Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and UNITED STATE OF AMERICA<br><br>Defendants. | Case No. 19-cv-731<br><br>**CLASS ACTION COMPLAINT** |

1   Additional Counsel for Plaintiffs

2   Laboni Hoq, SBN 224140
    lhoq@advancingjustice-la.org
3   Christopher Lapinig, SBN 322141
    clapinig@advancingjustice-la.org
4   Michelle (Minju) Cho, SBN 321939
    mcho@advancingjustice-la.org
5   ASIAN AMERICANS ADVANCING JUSTICE – LOS ANGELES
    1145 Wilshire Blvd., 2nd Floor
6   Los Angeles, CA 90017
    Telephone: (213) 977-7500/Fax: (213) 977-7500
7
    Jingni (Jenny) Zhao, SBN 284684
8   jennyz@advancingjustice-alc.org
    Winifred Kao, SBN 241473
9   winifredk@advancingjustice-alc.org
    ASIAN AMERICANS ADVANCING JUSTICE – ASIAN LAW CAUCUS
10  55 Columbus Avenue
    San Francisco, California 94111
11  Telephone: (415) 896-1701/Fax: (415) 896-1702

12  Tami Weerasingha-Cote, SBN 995355 (Washington, D.C.)*
    tweerasi@sidley.com
13  Ava X. Guo, SBN 1027694 (Washington, D.C.)*
    aguo@sidley.com
14  Kimberly Leaman, SBN 85925 (Virginia)*
    kimberly.leaman@sidley.com
15  Tyler Domino, SRN 5614631 (New York)*
    tdomino@sidley.com
16  Jon Dugan, SBN 93480 (Virginia)*
    jdugan@sidley.com
17  SIDLEY AUSTIN LLP
    1501 K Street, NW
18  Washington D.C., 20005
    Telephone: (202) 736-8000/Fax: (202) 736-8711
19
    Attorneys for Plaintiffs.
20
    *pro hac vice application forthcoming
21

22

23

24

25

26

27

28

**INTRODUCTION**

1.     Plaintiffs, beneficiaries of Temporary Protected Status ("TPS") from Nepal and Honduras and U.S.-citizen children of TPS holders from those two countries, challenge the Trump Administration's recent decisions to terminate the TPS designations for Nepal and Honduras. TPS is a form of humanitarian immigration relief that allows individuals from designated countries to lawfully live and work in the United States when they cannot safely return to their country of origin due to armed conflict, natural disaster, or other "exceptional circumstances." 8 U.S.C. 1254a ("the TPS statute"). On October 3, 2018, the United States District Court for the Northern District of California issued a preliminary injunction halting the Trump Administration's earlier decisions to terminate TPS for individuals from El Salvador, Haiti, Nicaragua, and Sudan in *Ramos v. Nielsen*, Case No. 18-cv-01554-EMC. The defects identified in *Ramos* also infect the decisions challenged here.

2.     Currently, more than 100,000 individuals from Honduras and Nepal hold TPS. Many of them came to this country at a young age and have lived here productively for most of their lives. They have homes, spouses, jobs, businesses, and extensive social ties to their communities. TPS holders are also the parents of thousands of U.S.-citizen children, many of whom are school-aged.

3.     Congress created TPS in 1990 to establish formal criteria and procedures to replace various ad hoc practices the Executive Branch had previously used for decades in affording similar humanitarian relief to people from various countries. The power to designate, extend, or terminate TPS for individual countries now resides with the Secretary of the Department of Homeland Security ("DHS").

4.     When deciding whether to continue or instead terminate a country's TPS designation, under every prior administration, DHS (and prior to its inception, the Attorney General) regularly considered all of the conditions in that country, including the impact of natural disasters and social or economic crises that occurred *after* the country's original TPS designation.

5.     But after President Trump took office, DHS—without any formal announcement or other explanation and without acknowledging any departure from past practice—adopted a new

1    interpretation of the TPS statute that eschews consideration of intervening country conditions. At

2    times, DHS has maintained that the TPS statute requires this new interpretation. It does not.

3        6.    As substantial evidence obtained from the *Ramos* litigation and elsewhere reveals, the

4    decision to adopt that new interpretation, as well as the resulting decisions terminating TPS

5    designations, were motivated by racial animus. President Trump has repeatedly broadcast his animus

6    towards non-white, non-European immigrants. Most important, during a meeting in the White House

7    discussing a legislative proposal that would have granted permanent residency to people from certain

8    TPS-designated countries, he asked why the deal included people from "shithole countries" and

9    expressed a preference for immigrants from countries "like Norway."

10       7.    The district court in *Ramos* examined extensive evidence of the White House's

11   racially discriminatory motivations and the pressure it exerted, at multiple levels, to influence the

12   TPS decisions. The court also found that the Acting Secretary of DHS was influenced by that

13   pressure. She "expressly acknowledged that the terminations of TPS designations were . . . designed

14   to fit the President's objectives on immigration which would put 'America first.'"

15       8.    As a result of this "America first view," the Trump Administration has approached

16   TPS decisions with the stated goal of ending TPS "in general." Since President Trump was sworn

17   into office, DHS has announced decisions that, if permitted to take effect, would eliminate TPS

18   protection for 98 percent of all TPS holders.

19       9.    In the wake of the initial terminations of TPS designation for El Salvador, Haiti,

20   Nicaragua, and Sudan, TPS-holder plaintiffs from those countries and their U.S.-citizen children

21   successfully challenged the legality of those decisions in the United States District Court for the

22   Northern District of California, winning a preliminary injunction against those TPS terminations

23   under the Administrative Procedure Act ("APA") and the equal protection guarantee of the Fifth

24   Amendment to the U.S. Constitution. *See* Order Granting Plaintiffs' Motion for Preliminary

25   Injunction, *Ramos v. Nielsen*, No. 3:18-cv-01554-EMC, ECF No. 128.

26       10.   The *Ramos* court concluded that the plaintiffs were likely to succeed on the merits of

27   their claim under the APA because "a wealth of record evidence" showed that, under President

28   Trump, "DHS made a deliberate choice to base the TPS decision solely on whether the originating

conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad, and that this was a clear departure from prior administration practice." *Id*. Thus, in terminating TPS for those countries, DHS adopted a new standard that departed from long-standing practice without any reasoned explanation, in violation of the APA. *Id*.

11.     The *Ramos* court also found that the plaintiffs had raised serious questions on the merits of their Fifth Amendment claim, which alleged that DHS's TPS termination decisions and departures from prior practice were motivated and influenced by racial animus against non-white, non-European immigrants. *Id*.

12.     After *Ramos* was filed but before the court granted the preliminary injunction,[1] Defendants announced the termination of TPS for Nepal and Honduras. Those decisions were made using the same flawed procedures described in *Ramos* and were infected by the same race-based motivation as the prior terminations.

13.     As a result of DHS's unlawful actions, approximately 86,000 Honduran TPS holders and 15,000 Nepali TPS holders face the loss of their ability to live and work lawfully in this country. In addition, TPS holders from Nepal and Honduras have over 50,000 U.S.-citizen children. These children, many of whom are school-aged, face an impossible choice between leaving the only home they have ever known and growing up without one or both of their parents.

14.     Plaintiffs challenge the termination of TPS for Honduras and Nepal on several grounds.

15.     First, Defendants' sudden and unexplained deviation from decades of consistent interpretation of the TPS statute and corresponding processes for extending or terminating TPS designations violates the APA. DHS terminated the TPS designations for Honduras and Nepal based solely on a consideration of whether the originating conditions prompting the designation have been abated. Defendants' *sub silentio* departure from existing standards and practices fails to meet the minimum standards of considered judgment required by the APA.

---

[1] *Ramos* was originally filed on March 12, 2018. *See* Class Action Complaint, *Ramos v. Nielsen*, No. 3:18-cv-01554 (N.D. Cal. Mar. 12, 2018), ECF No. 1. The court denied Defendants' motion to dismiss five months later. *See* Order Denying Defendants' Motion to Dismiss, *Ramos v. Nielsen*, No. 3:18-cv-01554 (N.D. Cal. Aug. 6, 2018), ECF No. 55.

16.     Defendants and others in the Trump Administration have, at times, attempted to justify their new standard by asserting that the TPS statute prohibits consideration of intervening conditions. But that assertion is incorrect as a matter of law. When an agency acts based on a flawed legal rationale, the courts have authority to set aside the resulting agency decisions.

17.     Second, Defendants' new standard for determining whether to extend TPS and the corresponding terminations issued under that standard violate the equal protection guarantee of the Fifth Amendment's Due Process Clause because they were motivated by intentional race-, ethnicity-, and national-origin-based animus against TPS holders. In the lead-up to making TPS extension or termination decisions, the Trump Administration repeatedly expressed animus towards non-white, non-European immigrants, referred to TPS-designated nations as "shithole countries," and reviewed TPS designations with the goal of removing non-white, non-European immigrants from the United States. DHS was directly influenced by the White House and its racist immigration policies, and it made decisions regarding TPS terminations on that unlawful basis.

18.     Third, the new standard violates TPS beneficiaries' Fifth Amendment's Due Process right against arbitrary government invasion of personal liberty. The new standard constitutes an arbitrary, unexplained abandonment of the government's long-standing interpretation of the TPS statute, on which several hundred-thousand TPS holders have come to rely. The Due Process Clause forbids the government from engaging in such arbitrary action when individual liberty and property interests are at stake.

19.     Finally, Defendants' imposition of an arbitrary new standard motivated by invidious discrimination violates the substantive due process rights of school-aged U.S.-citizen children of TPS holders, by presenting them with an intolerable choice: either leave this country or be forced to live without their parents. Families have a well-established, fundamental right to live together free from unwarranted government interference, and citizens of the United States have an absolute right to reside in this country. DHS's abrupt changes in TPS-related process and standards do not advance a legitimate government interest sufficient to justify the significant burden on both of these rights created by the TPS terminations.

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction under 28 U.S.C. 1331, because this action arises under the Constitution and the laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. 701–706.

21.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. 702. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). Moreover, sovereign immunity would not bar claims against federal officials that seek solely to prevent future violations of federal law (rather than monetary relief). *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

22.     Venue is proper in the Northern District of California under 28 U.S.C. 1391(e)(1), because at least one Plaintiff resides in this judicial district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

**INTRADISTRICT ASSIGNMENT**

23.     This civil action should be assigned to the San Francisco Division, because a related case, *Ramos et al. v. Nielson et al.*, No. 3:18-cv-1554, is located in the San Francisco Division. In addition, assignment in the San Francisco Division is appropriate for purposes of Civil Local Rules 3-2(d) and 3-5(b) because one of the claims of the named Plaintiffs arises in Alameda County.

**THE PARTIES**

**Plaintiffs**

24.     Plaintiff Keshav Raj Bhattarai, fifty-six years old, was born in Nepal. He and his wife have lived in the United States and held TPS since 2015. He lives in Sunnyvale, California.

25.     Plaintiff Sajjan Pandey, sixty-four years old, was born in Nepal and has lived in the United States since 2006. He has held TPS since 2015, and lives in Alameda, California.

26.     Plaintiff Sumnima Thapa, thirty-five years old, was born in Nepal and has lived in the United States since 2002. She and her husband hold TPS, and they have two young U.S.-citizen sons, aged six and ten. She lives in Apple Valley, Minnesota.

27. Plaintiff S.S. is ten years old and the son of Sumnima Thapa and her husband. He was born in Minnesota and is a U.S. citizen. He lives in Apple Valley, Minnesota.

28. Plaintiff Donaldo Posadas Caceres was born in Honduras and has lived in the United States since 1998. He, his wife, and his eldest son have held TPS since 1999. He has two U.S.-citizen daughters, aged eighteen and nine. He lives in Baltimore, Maryland.

29. Plaintiff G.D.P. is nine years old and the daughter of Donaldo Posadas Caceres and his wife. She was born in the United States and is a U.S. citizen. She lives in Baltimore, Maryland.

30. Plaintiff Sorayda Betzabe Rodriguez Motiño was born in Honduras. She has lived in the United States since December 1998 and has had TPS since 1999. Her husband is a TPS holder as well. They live in Harrisonburg, Virginia with their two U.S.-citizen children, aged fifteen and eight.

31. Plaintiff Denis Alen Molina Chavez was born in Honduras. He has lived in the United States since July 1997 and has had TPS since 1999. He is a widow and single father to two U.S.-citizen children, aged 13 and 12. He lives in Bridgeport, Connecticut.

**Defendants**

32. Defendant Kirstjen Nielsen, sued in her official capacity, is currently the Secretary of Homeland Security. Defendant Nielsen assumed office on or around December 6, 2017. As the highest-ranking officer for DHS, Defendant Nielsen is responsible for, among other things, "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5). On or about May 22, 2018, Defendant Nielsen terminated the designation of TPS for Nepal, and on or about June 5, 2018, Defendant Nielsen terminated the designation of TPS for Honduras.

33. Defendant Elaine C. Duke, sued in her official capacity, is currently the Deputy Secretary of Homeland Security and served as Acting Secretary of Homeland Security from around July 31, 2017 to December 6, 2017 or thereabout. As the chief operating officer for DHS, Defendant Duke is responsible for the administration and enforcement of the immigration laws of the United States.

34. Defendant U.S. Department of Homeland Security is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. 551(1). DHS includes various component agencies, such as the U.S. Citizenship and Immigration

Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). DHS, together with all of its component agencies, is responsible for administering and enforcing the nation's immigration laws and policies, including the TPS statute.

35.     Defendant United States of America includes all government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS statute.

## **STATUTORY FRAMEWORK**

36.     Congress established the TPS program through the Immigration Act of 1990.[2] TPS is a form of humanitarian relief, providing lawful immigration status to eligible foreign nationals who cannot safely return home to war-torn or disaster-stricken countries. By enacting the TPS statute, codified at 8 U.S.C. 1254a, Congress established formal criteria for relief and set forth predictable procedures for issuing, extending, or terminating that relief.[3]

37.     Under the TPS statute, the Secretary of Homeland Security[4] may make a "designation" determination for a given country. After consulting with "appropriate" government agencies, the Secretary may designate a foreign state, or any part of that state, for TPS based on: (A) an "ongoing armed conflict within the state" that would "pose a serious threat" to the "personal safety" of returning nationals of that state; (B) an "earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions" if the foreign state is "unable, temporarily, to handle adequately the return to the state" of its nationals and the foreign state has "officially" requested a designation; or (C) "extraordinary

---

[2] Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36.

[3] The Executive Branch previously used *ad hoc* enforcement-based mechanisms to allow individuals to remain in the United States for humanitarian reasons. *See* Adam B. Cox & Cristina Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 501–02 (2009) (discussing use of the "parole power," codified at 8 U.S.C. 1182(d)(5)). For example, Presidents occasionally exercised their discretion to designate countries for "Extended Voluntary Departure" and "Deferred Enforced Departure." Similar to TPS, both of those delayed-departure practices allowed foreign nationals to lawfully remain and work in the United States while conditions in their homeland were unsafe or return was otherwise impracticable.

[4] References to the Attorney General in provisions describing functions that have been transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557.

and temporary conditions in the foreign state" that prevent its nationals from safely returning, and where the temporary presence of those foreign nationals in the United States is not "contrary to the national interest of the United States."[5]

38.     An initial TPS designation period for a given country lasts between six and eighteen months.[6] Before the designation can become effective, the Secretary must publish a notice in the Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and an estimate of the number of foreign nationals eligible for protected status.

39.     Once the Secretary has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for TPS. To be eligible for TPS, applicants from a designated country must meet stringent requirements. These requirements include continued physical presence and continued residence in the United States from the most recent date of the foreign state's designation through the date of the TPS application; satisfaction of certain criteria for admissibility as an immigrant; lack of disqualifying criminal history; and submission of an application, extensive documentation, and fees.[7]

40.     Congress intended that individuals who were ultimately granted protected status would enjoy the freedom to live and work in the United States without fear of removal or other reprisal. Under the statute, an individual who receives and maintains TPS shall be authorized to engage in employment in the United States; shall not be detained by the Secretary of Homeland Security on the basis of immigration status; and shall not be removed from the United States by the Department of Homeland Security.[8]

41.     Under the TPS statute, the Secretary must periodically re-evaluate country designations. At least 60 days before a TPS designation is set to expire, the Secretary must "review the conditions in the foreign state" and determine whether the country still meets the conditions for TPS.[9] This periodic-review requirement also entails consultation with appropriate government

---

[5] 8 U.S.C. 1254a(b)(1).
[6] 8 U.S.C. 1254a(b)(2), (b)(3)(C).
[7] 8 U.S.C. 1254a(c)(1); 8 C.F.R. 244.2, 244.4, 244.9.
[8] 8 U.S.C. 1254a(a)(1), (d)(4).
[9] 8 U.S.C. 1254a(b)(3).

agencies. Unless the Secretary determines that the conditions warranting designation of TPS for a particular country no longer exist, the designation will be extended—by default—for a period of six months or, at the Secretary's discretion, for a period of twelve or eighteen months.[10] The resulting decision must be published by notice in the Federal Register.

42.     When TPS is terminated for a particular country, the individual TPS holder's status typically will revert back to his or her prior immigration status.[11]

## THE TRUMP ADMINISTRATION ADOPTED A NEW STANDARD FOR TPS DECISIONS IN ORDER TO BRING ABOUT THE END OF TPS

43.     After President Trump took office, the White House began to pressure DHS to end TPS.

44.     The White House Domestic Policy Council sought repeatedly to influence the decision-making process at the State Department and DHS to ensure a predetermined outcome: the termination of TPS designations. Stephen Miller, President Trump's senior advisory for domestic policy, "frequently" reached out to DHS to urge termination.

45.     Officials from President Trump's immigration transition team, including Kathy Nuebel Kovarik and Lee Francis Cissna, assumed high-level positions at DHS and USCIS, where they directly shaped TPS policy. In October 2017, Kovarik hired Robert Law and assigned him responsibility for editing career staffs' TPS recommendations. Law had previously worked for the "anti-immigrant hate group" Federation for American Immigration Reform ("FAIR"), where he co-authored a report for the 2017 Trump Presidential Transition calling to "revoke TPS for any country that has received more than two renewals."

46.     In order "to get to the President/White House's desired result of terminating TPS," President Trump's political surrogates within DHS made numerous changes to TPS practices.[12] Most significantly, under their leadership, DHS abandoned a long-established standard under which it considered all current conditions—including intervening events—in deciding whether to extend or

---

[10] 8 U.S.C. 1254a(b)(3)(C).
[11] 8 C.F.R. 244.19.
[12] Order Granting Plaintiffs' Motion for Preliminary Injunction, *Ramos v. Nielsen*, No. 3:18-cv-01554-EMC, ECF No. 128, at 32.

terminate a country's TPS designation. In its place, DHS adopted a new, narrow standard in which DHS considers only whether the original conditions that initially gave rise to the TPS designation persist.

47.     Before the Trump Administration, for at least twenty years, Republican and Democratic Administrations alike regularly relied on "[i]ntervening factors arising after a country's original TPS designation to extend TPS." Secretaries considered "the full range of current country conditions" in making TPS decisions, regardless of whether those conditions traced back to the event that triggered the original designation.

48.     Under the Trump Administration, in contrast, extensions would be permitted only when warranted by the continued effects of the original event triggering the TPS designation.

49.     In June 2017, then-Secretary Kelly described the new standard. He testified at a Senate hearing that DHS could only consider the original reason for a country's designation when recommending extension or termination. He explained that, in the administration's view, TPS "is for a specific event. In Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS was—was granted and—and that's how I have to look at it."[13]

50.     Secretary Nielsen later echoed Kelly's view. She testified, "[t]he law does not allow me to look at the country conditions of a country writ large. It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist. . . . [T]he law requires me, if I cannot say that the conditions emanating from the [earthquake in Honduras that originated the need for a TPS designation] still exist, regardless of other systemic conditions, I must terminate TPS."[14] She also testified, "[t]he law says that if the effects of the

---

[13] *Hearing on the Department of Homeland Security F.Y. 2018 Budget Before the S. Comm. on Homeland Security and Governmental Affairs*, 115th Cong. (June 6, 2017) (statement of Secretary John F. Kelly), https://www.c-span.org/video/?429383-1/secretary-kelly-travel-ban-injunctions-hobbling-homeland-security-screening-effort&start=5492.

[14] *Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018) (statement of Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security).

originating event, so that's a causation issue, do not continue to exist, then the Secretary of Homeland Security must terminate [TPS]. . . . If the underlying conditions in a country are themselves dangerous, unfortunately that is not something that I can consider in the termination."[15]

51.     Internal agency guidance prepared by the Trump-era DHS directed, "[t]he law requires that when the conditions prompting a country's original designation for TPS no longer exist, the Department must terminate the country's TPS designation."

52.     The White House directly urged the new standard as part of its overall effort to end TPS and as applied to specific countries. For example, in November 2017, three days before the statutory deadline for TPS decisions for Nicaragua and Honduras, the White House convened a Cabinet-level meeting urging termination for Nicaragua, Honduras, Haiti, and El Salvador. In a "Discussion Paper" to guide the meeting, the White House applied the new standard, asserting that termination was required because "the temporary conditions that arose out of natural disasters and supported [the original] TPS designations have long ceased to exist."

53.     As one source described, following the meeting, White House Chief of Staff John Kelly and Homeland Security Advisor Tom Bossert called Acting Secretary Elaine Duke and "put massive pressure on her" to terminate TPS for Honduras and Nicaragua.[16] They told her that TPS was an obstacle to the President's "wider strategic goal" on immigration.[17]

54.     Subsequently, Acting Secretary Duke determined that "[t]he TPS program must end for these countries soon." She acknowledged that "[t]his conclusion [was] the result of an America first view." She then terminated TPS for Nicaragua. She declined to make a decision on TPS for Honduras, with the result that its TPS designation was automatically extended for six months. 8 U.S.C. 1254a(b)(3)(C). She made clear, however, that termination for Honduras was imminent under

---

[15] *Hearing on the Department of Homeland Security F.Y. 2019 Budget Before the H. Comm. on Appropriations*, 115th Cong. (Apr. 11, 2018) (statement of Secretary Kirstjen Nielsen), https://www.c-span.org/video/?443752-1/homeland-security-secretary-nielsen-testifies-fiscal-year-2019-budget.
[16] Nick Miroff, *White House chief of staff tried to pressure acting DHS secretary to expel thousands of Hondurans, officials say*, WASH. POST (Nov. 9, 2017), https://www.washingtonpost.com/world/national-security/white-house-chief-of-staff-tried-to-pressure-acting-dhs-secretary-to-expel-thousands-of-hondurans-officials-say/2017/11/09/914d3700-c54a-11e7-a441-3a768c8586f1_story.html?utm_term=.a3d52a717ec9.
[17] *Id.*

the new standard. In an email to White House Chief of Staff Kelly, she explained that her "no decision" on Honduras was "a strong break with past practice. . . . By not affirmatively extending, I'm stating that I'm not satisfied that the country conditions remain—but not yet sure how best to end TPS for this country." She described her decisions as "send[ing] a clear signal that TPS in general is coming to a close . . . consistent with the President's position on immigration."

55.     In addition to adopting a new standard for TPS decisions, the Trump Administration altered the process for conducting TPS reviews in other ways.

56.     Prior to the Trump Administration, TPS review began with an objective country conditions report prepared by career specialists. The reports formed the basis for decision memos containing the USCIS Director's recommendation to the DHS Secretary and Federal Register notices announcing the decision. Career officials would draft Federal Register notices in tandem with the decision memos, because the final decisions published in those notices were guided by the recommendations from the career staff in the decision memos.

57.     In the Trump era, this process changed. Political surrogates assumed responsibility for the periodic TPS reviews. They disregarded the recommendations of career professionals and rewrote decision memos so that the memos would "fully support" the pre-determined decision to terminate TPS. Political surrogates also assumed control of drafting the Federal Register notices. Whereas under prior administrations the Federal Register notice followed logically from career officials' drafts of the decision memos, under the Trump Administration this was no longer the case.

58.     In addition, whereas prior administrations had typically conducted separate review processes for each country, the Trump Administration reviewed multiple countries together, even though each had different originating and current conditions. For example, the White House "coordinat[ed] the conditions and process for terminating [TPS] for aliens from El Salvador, Honduras, Nicaragua, and Haiti."

59.     Moreover, input from U.S. embassies, traditionally accorded great weight, was disregarded by the Trump-era DHS, because the input did not support the goal of termination. As James D. Nealon, chief of the DHS Office of Policy and former U.S. Ambassador to Honduras, testified, the State Department traditionally afforded great weight to ambassadors' input. Under prior

administrations there would have been significant debate if DHS were to reject an ambassador's recommendation in favor of a contrary, internal recommendation. However, this all changed under the current administration. State Department leadership ignored cables from U.S. embassies in TPS-designated countries that sought to convey country conditions and offer recommendations on TPS decisions. Additionally, in some cases, State Department leadership stalled providing recommendations drafted by career State Department professionals until it was too late for DHS to substantively consider them.

60.     The first TPS termination announced by the Trump Administration was for Sudan in September 2017. In a draft decision memo, career officials reviewed a broad range of country conditions, including intervening conditions, and concluded, "termination does not appear to be warranted." Political surrogates then edited the memo to recommend termination. In support, they tacked on a section focused narrowly on the factors that triggered Sudan's original designation. The resulting decision memo was so incoherent that the current USCIS Director Francis Cissna said it read "like one person who strongly supports extending TPS for Sudan wrote everything up to the recommendation section and then someone who opposes extension snuck up behind the first guy, clubbed him over the head, pushed his senseless body out of the way, and finished the memo." The memo was changed several more times before ultimately being revised "to clearly support the . . . decision to terminate."

61.     Subsequent terminations "underwent a similar process." For example, Kovarik complained in October 2017 of a "problem" in decision memos drafted by career professionals for Honduras, Nicaragua, and El Salvador, because they "read[] as though we'd recommend an extension b/c we talk so much about how bad it is, but there's not enough in there about positive steps that have been taken since it's designation." A career professional responded, "We can comb through the country conditions to try to see what else there might be, but the basic problem is that it IS bad there [with respect to] all of the standard metrics. Our strongest argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters prompting the designations."

62.     DHS applied these same flawed processes to the two TPS terminations at issue in this case—for Nepal and for Honduras.

**<u>Nepal</u>**

63.     On April 26, 2018, Secretary Nielsen announced her decision to terminate TPS for Nepal, with a twelve-month delayed effective date. [18] Like previous Trump-era TPS terminations, the decision was the product of the White House's persistent and ongoing effort to end TPS.

64.     Nepal was first designated for TPS by Secretary Jeh Johnson on June 24, 2015, after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes.[19] On October 26, 2016, DHS extended Nepal's designation for eighteen months.[20] The extension took into account a variety of factors and conditions that arose subsequent to the original designation, many of which were wholly or partially unrelated to the earthquakes, including civil unrest, the obstruction of crossings at the Nepal-India border, and inadequate sanitation.[21]

65.     In terminating Nepal's TPS, DHS applied its new standard. The Secretary considered only whether Nepal had recovered from the earthquake that triggered its original designation; intervening conditions that affected the country were not considered except to the extent they related directly to the original basis for designation.

66.     During the periodic review process for Nepal, Trump surrogate Kathy Nuebel Kovarik instructed career employees to focus the country conditions report "specifically . . . on progress in earthquake and recovery efforts" as opposed to the "extremely comprehensive" overview

---

[18] Press Release, U.S. Dep't of Homeland Security, Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal (Apr. 26, 2018) (emphases added), https://www.dhs.gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal.
[19] Designation of Nepal for Temporary Protected Status, 80 Fed. Reg. 36,346, 36,347 (June 24, 2015).
[20] Extension of the Designation of Nepal for Temporary Protected Status, 81 Fed. Reg. 74,470 (Oct. 26, 2016).
[21] *Id.* at 74,471.

"usually" provided. In response, career employees agreed "not to devote research" to political crises and other intervening conditions not directly related to the earthquake.

67.    An early draft decision memo for Nepal described the decision whether to extend or terminate as a "close case." It described the destructive intervening events that had befallen Nepal but then dismissed them, because they were not "primarily" related to the original event, stating: "In August 2017, the worst rains in 15 years struck Nepal, triggering widespread large-scale flooding and landslides, causing significant property damage, and impacting access to food, water, and healthcare, albeit primarily in the southern plains region that has been little affected by the earthquake." The draft recommended termination with an eighteen-month wind down period.

68.    Upon reviewing a subsequent draft decision memo, Director Cissna complained that it did not "adequately support the proposal to terminate TPS." He noted specific sections of the memo that he viewed as problematic, including factual statements about challenges to Nepal's rebuilding efforts and the number of individuals still living in temporary shelters.

69.    The final Nepal decision memo recommended termination with a twelve-month wind down period and no longer described the decision as a "close case." The memo emphasized original conditions and significantly downplayed the significance of any intervening factors. For example, it limited consideration of the damage caused by severe, post-earthquake flooding in Nepal to simply one of several "[f]actors delaying the completion of recovery and reconstruction efforts" but otherwise "unrelated to the earthquake that led to the TPS designation" and, therefore, not relevant to the termination decision. To the extent the decision memo considered the independent effects of severe flooding, it was only to assert that disruption caused by the flooding did not "rise to the level of a new event that would warrant a new TPS designation."

70.    In a Press Release announcing the termination of TPS for Nepal, DHS explained, "[t]he decision to terminate TPS for Nepal was made after a review of the environmental disaster-

related conditions upon which the country's original designation was based and an assessment of whether those originating conditions continue to exist as required by statute."[22]

71.     Accompanying DHS Press Affairs Guidance stated, "[b]ased on careful consideration of available information . . . the Secretary determined that the original conditions caused by the 2015 earthquake no longer exist. Thus, as required under the applicable statute, the current TPS designation must be terminated."

72.     The announcement terminating Nepal's TPS was published in the Federal Register on May 22, 2018.[23] The Federal Register Notice made no mention of intervening events and did not discuss the severe flooding of August 2017.

**Honduras**

73.     On May 4, 2018, Secretary Nielsen announced her decision to terminate TPS for Honduras with an eighteen-month delayed effective date. Again, like the previous Trump-era TPS terminations, her decision was the product of the Trump Administration's systematic effort to end TPS. It effectuated a predetermined conclusion articulated by Acting Secretary Duke months earlier, when she allowed a short, automatic six-month extension for Honduras because she was "not yet sure how best to end TPS for this country."

74.     Honduras was originally designated for TPS on January 5, 1999 by Attorney General Janet Reno, after Hurricane Mitch caused severe damage to the country.[24] Multiple Attorneys General and DHS Secretaries extended TPS for Honduras in regular periodic reviews over nearly twenty years—fourteen times in all.[25] Those extensions took into consideration social, economic,

---

[22] Press Release, U.S. Dep't of Homeland Security, Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal (Apr. 26, 2018) (emphases added), https://www.dhs. gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal.
[23] Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 23,705 (May 22, 2018).
[24] Designation of Honduras Under Temporary Protected Status, 64 Fed. Reg. 524,(Jan. 5, 1999); Extension of the Designation of Honduras for Temporary Protected Status, 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) ("Hurricane Mitch resulted in the loss of thousands of lives, displacement of thousands more, collapse of physical infrastructure, and severe damage to the country's economic system.").
[25] The Attorneys General and DHS Secretaries responsible for extending Honduras's TPS designation are Attorney General Janet Reno, Attorney General John Ashcroft, DHS Secretary Tom

environmental, and infrastructural challenges that were not directly attributable to the hurricane.[26] For instance, decisions to extend TPS for Honduras cited environmental disasters that occurred *after* Hurricane Mitch,[27] a "deteriorating economy," and a "political crisis" that "significantly reduc[ed] economic activity."[28]

75.     In terminating Honduras's TPS, DHS applied its new standard. The Secretary assessed only whether Honduras had recovered from Hurricane Mitch and did not consider intervening conditions.

76.     For example, the Honduras decision memo explicitly dismissed "current challenges" because they "cannot be directly tied to damage from the storm 20 years ago."

---

Ridge, DHS Secretary Michael Chertoff, DHS Secretary Janet Napolitano, and DHS Secretary Jeh Johnson. *See* Extension of the Designation of Honduras for Temporary Protected Status, 82 Fed. Reg. 59,630 (Dec. 15, 2017); Extension of the Designation of Honduras for Temporary Protected Status, 81 Fed. Reg. 30,331 (May 16, 2016); Extension of the Designation of Honduras for Temporary Protected Status, 79 Fed. Reg. 62,170 (Oct. 16, 2014); Extension of the Designation of Honduras for Temporary Protected Status, 78 Fed. Reg. 20,123 (Apr. 3, 2013); Extension of the Designation of Honduras for Temporary Protected Status, 76 Fed. Reg. 68,488 (Nov. 4, 2011); Extension of the Designation of Honduras for Temporary Protected Status, 75 Fed. Reg. 24,734 (May 5, 2010); Extension of the Designation of Honduras for Temporary Protected Status, 73 Fed. Reg. 57,133 (Oct. 1, 2008); Extension of the Designation of Honduras for Temporary Protected Status, 72 Fed. Reg. 29,529 (May 29, 2007); Extension of the Designation of Honduras for Temporary Protected Status, 71 Fed. Reg. 16,328 (Mar. 31, 2006); Extension of the Designation of Honduras for Temporary Protected Status, 69 Fed. Reg. 64,084 (Nov. 3, 2004); Extension of the Designation of Honduras for Temporary Protected Status, 68 Fed. Reg. 23,744 (May 5, 2003); Extension of the Designation of Honduras for Temporary Protected Status, 67 Fed. Reg. 22,451 (May 3, 2002); Extension of the Designation of Honduras for Temporary Protected Status, 66 Fed. Reg. 23,269 (May 8, 2001); Extension of the Designation of Honduras for Temporary Protected Status, 65 Fed. Reg. 30,438 (May 11, 2000).

[26] *See, e.g.*, Extension of the Designation of Honduras Under the Temporary Protected Status Program, 68 Fed. Reg. 23,744 (May 5, 2003).

[27] *See, e.g.*, *id.* ("[R]ecent droughts as well as flooding from Hurricane Michelle in 2001 have added to the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998."); Extension of the Designation of Honduras Under the Temporary Protected Status Program, 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) ("[O]ther natural disasters have occurred since Hurricane Mitch, including flooding in October 2008 and an earthquake in May 2009, which have further delayed the recovery from Hurricane Mitch.").

[28] Extension of the Designation of Honduras Under the Temporary Protected Status Program, 75 Fed. Reg. 24,734, 24,735 (May 5, 2010).

77.     The DHS press release announcing the Secretary's decision explained, "[T]he Secretary determined that the disruption of living conditions in Honduras *from Hurricane Mitch that served as the basis for its TPS designation* has decreased to a degree that it should no longer be regarded as substantial. . . . Thus, as required under the applicable statute, the current TPS designation *must* be eliminated."[29]

78.     On the same day that DHS publicly announced the termination of TPS for Honduras (and about six weeks after the filing of *Ramos*, challenging the new practice as unlawful), an addendum was added to the Honduras decision memo. The addendum provides supplemental information on environmental conditions related to problems caused by pine beetles and coffee rust. The Federal Register Notice announcing the termination of TPS for Honduras, published on June 5, 2018, similarly mentions pine beetles and coffee rust, along with a range of other factors.

79.     The addendum and similar information in the Federal Register notice were added as *post hoc* justifications for DHS's decision to terminate TPS for Honduras. They do not reflect the narrower range of factors—based solely on the impact of Hurricane Mitch—actually considered by DHS in deciding to terminate.

80.     In a May 11, 2018 memorandum, members of the Senate Foreign Relations Committee complained that Defendants "deliberately disregarded the counsel and expertise of officials at the State Department and the U.S. Embassies in [Honduras, El Salvador, and Haiti], which uniformly argued for an extension of the TPS designations."[30] As the memorandum observed, the termination "was the result of an overtly political process."[31]

---

[29] Press Release, U.S. Dep't of Homeland Security, Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras (May 4, 2018) (emphasis added), https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.
[30] Memorandum from the Senate Foreign Relations Comm. Democratic Staff to Interested Parties (May 11, 2018), https://www.nationalimmigrationproject.org/PDFs/practitioners/our_lit/impact_litigation/2018_15May_tps-haiti-senatememo.pdf
[31] *Id.*

## THE CHANGES TO THE TPS CRITERIA AND THE ULTIMATE TERMINATIONS WERE MOTIVATED BY RACIAL ANIMUS

81.     The Secretary's adoption of a new standard for TPS decisions and the termination of TPS for Honduras and Nepal, like the previous Trump-era TPS terminations, were motivated in significant part by racial and national-origin animus. As the court found in *Ramos*, there is evidence that the terminations were designed to further a predetermined presidential agenda to end TPS influenced by the President's racial animus against non-white, non-European immigrants. This animus is evidenced by numerous statements made by President Trump and other officials in his administration expressing disdain for non-white, non-European immigrants.

82.     Throughout his candidacy and presidency, President Trump has repeatedly denigrated non-white, non-European immigrants and has expressed his interest in resurrecting a vision of American identity that privileges whiteness.

83.     On the very first day of his presidential campaign, then-candidate Trump categorically branded Mexican immigrants as criminals and rapists: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[32]

84.     Both during his campaign and after taking office, President Trump has repeatedly compared immigrants to snakes that will bite and kill anyone foolish enough to shelter them.[33]

85.     President Trump has repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, thereby endorsing their racist views and amplifying their message.[34]

---

[32] Wash. Post Staff, *Full Text: Donald Trump announces a presidential bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.0b727c71c4c8.

[33] Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, VOX (Feb. 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac.

[34] Donald J. Trump (realDonaldTrump), TWITTER (Jan. 22. 2016), https://twitter.com/realdonaldtrump/status/690562515500032000?lang=en.

86.     When a lawsuit against Trump University was assigned to Judge Gonzalo Curiel, then-candidate Trump repeatedly asserted that the Judge would be biased against him due to the Judge's Mexican heritage.[35]

87.     After a crowd of white nationalists marched on Charlottesville, Virginia, President Trump praised some of the protesters as "very fine people."[36]

88.     President Trump often conflates large groups of immigrants, and sometimes even all of them, with members of the MS-13 gang.[37] In his first State of the Union address, he suggested that the Deferred Action for Childhood Arrivals ("DACA") program, recipients of which are immigrants first brought to the United States as children many years ago, contributed to the spread of MS-13.[38]

89.     President Trump has also directed his racist remarks specifically at people who have lawful status through TPS.

90.     On or about January 11, 2018, several lawmakers gathered with the President in the Oval Office of the White House to discuss a bipartisan immigration proposal. President Trump grew frustrated when the conversation turned to a proposal that would grant permanent status to some people with TPS protections from certain Latin American and African countries. "Why," the President asked, "are we having all these people from shithole countries come here?"[39] He expressed a preference, instead, for immigrants from countries "like Norway."[40]

---

[35] Matt Ford, *Trump Attacks a 'Mexican' U.S. Federal Judge*, THE ATLANTIC (May 28, 2016), https://www.theatlantic.com/politics/archive/2016/05/trump-judge-gonzalo-curiel/484790/.
[36] Politico Staff, *Full text: Trump's comments on white supremacists, 'alt-left' in Charlottesville*, POLITICO (Aug. 15, 2017), https://www.politico.com/story/2017/08/15/full-text-trump-comments-white-supremacists-alt-left-transcript-241662.
[37] Terry Gross, *Trump Uses MS-13 To 'Sell Draconian Overhauls of Border Issues,' Journalist Says*, NPR (Feb. 15, 2018), https://www.npr.org/2018/02/15/585937834/trump-uses-ms-13-to-sell-draconian-overhauls-of-border-issues-journalist-says.
[38] Liz Robbins, *Why was MS-13 Targeted in Trump's Speech?*, N.Y. TIMES (Jan. 31, 2018).
[39] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.
[40] *Id.*

91.     Senator Dick Durbin, who was present at the January 11, 2018 meeting in the Oval Office, characterized the President's comments as "clearly racial," "hate-filled," and "vile."[41] Senator Durbin reportedly warned the President that excluding immigrants based on those grounds would be "an obvious racial decision."[42] Secretary Nielsen, also present at the January 11, 2018 Oval Office meeting,[43] acknowledged that the President used "tough language."[44] Although she claimed that she did not know whether Norway was a "predominately white country," she admitted that she "imagine[d] that is the case."[45]

92.     President Trump has repeatedly made disparaging remarks about people from Central America, including Honduras.

93.     In February 2018, President Trump gave a speech at the annual Conservative Political Action Conference, where he used MS-13 to disparage immigrants more generally, comparing them to snakes and animals.[46] Again, in May 2018 at an immigration roundtable discussion, President Trump relied on MS-13 to claim that undocumented immigrants "aren't people. They are animals."[47]

94.     On Twitter, President Trump lamented that Honduras is "doing nothing for the United States but taking our money."[48]

95.     President Trump has also made disparaging remarks about certain South Asian countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration.

---

[41] Carl Hulse, *Inside the Oval Office Immigration Meeting that Left a Senator Stunned*, N.Y. TIMES (Jan. 19, 2018), https://nyti.ms/2DiqhlM.
[42] *Id.*
[43] Walter Shapiro, *Opinion: White People in Norway? Who Knew?*, ROLL CALL (Jan. 17, 2018), https://www.rollcall.com/news/opinion/kirstjen-nielsen-trump-norway.
[44] *Id.*
[45] *Id.*
[46] Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.
[47] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals'*, POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/.
[48] Donald J. Trump (realDonaldTrump) TWITTER (Dec. 28, 2018), https://twitter.com/realdonaldtrump/status/1078638249562775552?lang=en.

96.    For example, while studying a map of the region in preparation for a meeting with the Prime Minister of India, the President deliberately "mispronounced Nepal as 'nipple' and laughingly referred to Bhutan as 'button.'"[49] The President is also "known to fake an Indian accent to imitate Indian Prime Minister Narendra Modi during Oval Office meetings."[50]

97.    President Trump has also expressed general animus toward other South Asian countries and individuals.

98.    On October 5, 2016, President Trump gave a speech discussing how "our country is being infiltrated . . . by terrorists," referring to "immigrants from high-risk regions."[51]

99.    In August of 2016, then-candidate Trump gave speeches lamenting that the United States is not "smart" because of the "problem [of terrorism] across our refugee and immigration programs." President Trump used an example of "two immigrants from Pakistan who later applied for and received U.S. citizenship" and who "were sentenced to decades long prison sentences for plotting to detonate a bomb" in New York City.[52]

100.    On June 13, 2016, President Trump remarked how the male shooter from San Bernardino, California "was the child of immigrants from Pakistan and he brought his wife – the other terrorist – from Saudi Arabia through another one of our easily exploited visa programs."[53] He further noted that immigration from Afghanistan is increasing and that "99% of people in Afghanistan support oppressive Sharia Law. We admit many more from other countries in the region who share these same oppressive views."[54]

---

[49] Daniel Lippman, *Trump's diplomatic learning curve: Time zones, 'Namibia' and 'Nipple'*, POLITICO (Aug. 13, 2018), https://www.politico.com/story/2018/08/13/trump-world-knowledge-diplomatic-774801.
[50] Cristina Maza, *Trump Fakes Indian Accent When Speaking About Indian Prime Minister Modi, Report Claims*, NEWSWEEK (Jan. 22, 2018), https://www.newsweek.com/trump-racist-president-imitates-modis-indian-accent-meetings-787071.
[51] *Speech: Donald Trump in Reno, NV*, FACTBASE, https://factba.se/transcript/donald-trump-speech-reno-nv-october-5-2016.
[52] *Speech: Donald Trump in Green Bay, WI*, FACTBASE, https://factba.se/transcript/donald-trump-speech-green-bay-wi-august-5-2016.
[53] *Remarks: Donald Trump at Saint Anselm College in Manchester NH*, FACTBASE, https://factba.se/transcript/donald-trump-remarks-manchester-nh-june-13-2016.
[54] *Id.*

101.     The President's repeated statements denigrating immigrants, including many directed at immigrants from TPS-designated countries, were not merely hateful rhetoric. They were also a call to action.

102.     As described above, *supra* ¶¶ 43–46, 52–54, the White House repeatedly inserted itself at all levels of DHS's decision-making on TPS to influence the process to favor termination. As the district court in *Ramos* found, "Acting Secretary Duke's writing suggest that she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."

103.     Similarly, as to then-Secretary Kelly, the district court found that his subordinates sought data on the number of TPS holders who committed crimes and relied on public assistance. "The information sought by the secretary coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole." Indeed, the political surrogates working for then-Secretary Kelly knew the request for information was improper, so they requested that the preparation of the data be "kept quiet."

104.     The motivation and methods for terminating TPS designations reveal that the President's documented animus for non-white, non-European immigrants infected the TPS decision-making process.

## DEPORTATION OF TPS HOLDERS WILL IMPOSE EXTRAORDINARY AND IRREPARABLE HARM ON TPS HOLDERS, THEIR MINOR U.S.-CITIZEN CHILDREN, AND THEIR COMMUNITIES

105.     All told, approximately 400,000 TPS holders currently reside in the United States,[55] approximately 86,000 of whom are Honduran TPS holders and 15,000 are Nepali TPS holders. TPS holders live in all fifty states, as well as in the District of Columbia and the U.S. territories. At least

---

[55] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Population from El Salvador, Honduras, and Haiti*, 5 J. ON MIGRATION & HUM. SEC. 577, 578 (2017); *see also* JILL H. WILSON, CONG. RES. SERV., TEMPORARY PROTECTED STATUS: OVERVIEW AND CURRENT ISSUES 4–5 (2018).

ten states are home to more than 10,000 TPS holders each. California, residence to over 80,000 TPS holders, is home to the greatest number of TPS holders in the country.[56]

106.    Children born in the United States, including those born to TPS holders, are U.S. citizens with an absolute right to remain in the United States as guaranteed by the Fourteenth Amendment.

107.    The wellbeing and future development of children are tied to nurturing and stable relationships with their parents.[57] Science has empirically confirmed this intuitive understanding. The most important factor in the development of brain architecture—the trillions of connections among and across neurons in a child's brain—is the interactive and responsive relationship between child and parent.[58] The parent-child relationship promotes healthy brain development and provides the buffering protection necessary to prevent children from experiencing the toxic responses to stress.[59]

108.    Children of immigrants suffer acutely when their parents face even the possibility of deportation. Fear of deportation is directly tied to stress-related illness in children, including higher levels of anxiety and trauma, depression, and family instability. The "fear of massive deportations"[60] also diminishes the quality of day-to-day relationships between parents and their children, in part because the threat of deportation deters parents from accompanying children to school or social events, seeking urgent or preventative health care for themselves and their children, pursuing opportunities for better housing, or reporting fraud, crimes, or abuse.

109.    U.S.-citizen children of TPS holders, including the Plaintiff children in this case, confront an impossible choice. On the one hand, they may continue to live with their parents, but only if they relocate to a foreign country, leaving behind their schools, their communities, and the

---

[56] Wilson, *supra* at 12.

[57] CTR. ON THE DEVELOPING CHILD AT HARV. UNIV., THREE PRINCIPLES TO IMPROVE OUTCOMES FOR CHILDREN AND FAMILIES 3–4 (2017), https://developingchild.harvard.edu/resources/three-early-childhood-development-principles-improve-child-family-outcomes/.

[58] *Id*.

[59] *Id*.

[60] Marie Leiner et al., *Fear of Massive Deportations in the United States: Social Implications on Deprived Pediatric Communities*, 5 FRONT. PEDIATR. 177, 177–78 (2017).

benefits of living in the United States—the only country they have ever known. On the other hand, they may choose to remain in the United States, thereby forgoing the right to live with one or both of their parents, which, in many cases, would involve TPS-holder children becoming a ward of the state.

110.    Plaintiff S.S., ten years old, is the eldest son of TPS holder Plaintiff Sumnima Thapa and her husband. S.S. was born in Minnesota, where he lives with his parents and younger brother. S.S. is in fifth grade and his favorite subjects are math, science, and gym. He loves science because he likes discovering things and doing experiments. S.S. is a yellow belt in karate and also enjoys playing soccer. If S.S. and his family were forced to leave the United States and move to Nepal he would miss his school and all of his friends.

111.    Plaintiff G.D.P., nine years old, is the youngest daughter of TPS holder Plaintiff Donaldo Posadas Caceres. She was born in Maryland, where she lives with her parents and older siblings, and is now a fourth grade student. Her favorite subjects are math, reading, and gym. She loves learning new things, especially about history. Outside of school, G.D.P.'s favorite activities are playing games with her family and going out to eat together. She dreams of growing up to be President because she wants to help people who come here from other countries.

112.    The scale of the harm wrought by Defendants' new TPS policies and practices is massive. TPS holders are the parents of more than 270,000 U.S.-citizen children.[61] There are more than 50,000 U.S.-citizen children whose parents are Honduran or Nepali TPS holders.[62]

113.    But even beyond the parent-child relationship, TPS holders have built lives in the United States over the course of years or decades, establishing roots and contributing to their communities. The circumstances of the TPS-holder Plaintiffs in this case vividly illustrate the irreparable harm that will occur if they (and other TPS holders) lose their TPS standing.

114.    Plaintiff Keshav Raj Bhattarai, fifty-six years old, was born in Nepal. Keshav's home was significantly damaged in the April 2015 earthquake, and he and his wife had to sleep outside in a tent for about a month. In May 2015, Keshav and his wife traveled to the United States to see their

---

[61] Warren & Kerwin, *supra* note 55, at 578.
[62] CTR. FOR AM. PROGRESS, TPS HOLDERS IN THE UNITED STATES 1 (2017).

son graduate from his medical fellowship program. About a month later, Nepal was designated for TPS and Keshav and his wife successfully applied for TPS status. Since receiving TPS, Keshav has worked in restaurants and gas stations. He currently lives in Sunnyvale, California, and works at a Chevron gas station, where he was recently promoted to assistant manager. His son is a doctor, trained in geriatrics and nephrology, and has lived and practiced in the United States for about ten years.

115.    Plaintiff Sajjan Pandey, sixty-four years old, was born in Nepal. In Nepal, he used to run a restaurant and a technical school. Sajjan arrived in the United States in 2006, and has lived here ever since. He lives with his cousin, who is a U.S. citizen, in Alameda, California. He is an attendant and cashier at a Chevron gas station in Oakland, California. TPS is essential to his ability to work and support himself. He regularly sends money back to Nepal to help family members whose homes were damaged after the earthquake. Additionally, for the last twelve years Sajjan has been an active volunteer and leader of Motherland Nepal, a nonprofit cultural organization based in the Bay Area that creates cultural programming and fundraises for people in need.

116.    Plaintiff Sumnima Thapa, thirty-five years old, was born in Nepal and arrived in the United States in 2002. She spent most of her childhood in Thailand, where she moved with her family at the age of four. Sumnima obtained her bachelor's degree in business management from Saint Catherine's College and her master's degree in project management from Saint Mary's University. Since March 2017, she has worked as a research specialist at Omni Data Retrieval, and she also previously volunteered with Lutheran Social Services. Sumnima lives in Apple Valley, Minnesota with her husband, also a TPS holder, and their two U.S.-citizen children, aged six and ten. Her youngest son has never been to Nepal, and her eldest son has visited Nepal only twice, once as an infant. Neither of Sumnima's sons speak Nepali fluently. She and her husband own their home in Minnesota, and without TPS Sumnima will be unable to work and will have difficulty paying her mortgage. She is frightened to think about bringing her family back to Nepal, a country she barely knows and where few of her family members live.

117.    Plaintiff Donaldo Posadas Caceres, forty-four years old, was born in Santa Rica Copan, Honduras. When he was young, in 1994, his brother was murdered in Honduras, leading

Donaldo to drop out of school for his protection and move to another city. He, his wife, and his eldest son, who was then a baby, entered the United States in July 1998. They have held TPS since 1999. Donaldo currently works as a bridge painter and is a member of the International Union of Painters and Allied Trades, commonly known as IUPAT. He owns his home in Baltimore, Maryland, where he lives with his wife and children. In addition to their eldest son, Donaldo and his wife have two U.S.-citizen daughters, aged eighteen and nine. His eldest daughter has been to Honduras only once, to visit her ailing grandfather, and his youngest daughter only twice, to visit her ailing grandfather and to attend her aunt's funeral.

118.    Plaintiff Sorayda Betzabe Rodriguez Motiño, thirty-six years old, was born in Honduras, where she was raised by her grandmother from a young age. A few days after Sorayda turned sixteen, she and her siblings came to the United States to look for their mother. They presented themselves at a port of entry on or around Christmas Eve of 1998 and Sorayda was placed in a shelter for unaccompanied minors. About two weeks later, Honduras was designated for TPS and Sorayda was released to her mother. She has held TPS ever since. Sorayda lives in Harrisonburg, Virginia with her husband, also a TPS holder, and two U.S.-citizen children. Her eldest child is autistic. She works at Great Eastern Resort as a supervisor of housekeeping. Sorayda is terrified at the thought of having to bring her children to Honduras, a place they have never been. Her children do not speak Spanish.

119.    Plaintiff Denis Alen Molina Chavez, fifty-two years old, was born in Honduras. He entered the United States in July 1997 and has had TPS since 1999. After a short time in New Jersey, he settled in Bridgeport, Connecticut, where he has lived ever since. Denis is a widow and the single father of two U.S.-citizen children, a thirteen-year-old son and a twelve-year-old daughter. Denis's wife passed away in 2013 from ovarian cancer. Denis is the lead pastor at the Church of Jude Mount Zion (Iglesia de Juda Monte de Sion) in Bridgeport, which has forty-five active members. He gives sermons on Wednesdays, Fridays, Saturdays, and Sundays, in partnership with three assistant pastors, and provides religious teaching for children and youth. Denis has been a pastor since he was twenty-four years old and has been an active member of the church since he was a child. Denis also works as a mechanic at Service My Auto in Bridgeport, where he has been employed for the past

eight years. Denis is very worried about what will happen to his life and the lives of his children if TPS is terminated. Denis is a homeowner; he and his wife bought their house less than a year and a half before she passed away. He relies on TPS to afford his mortgage, pay for the children's necessities, to work, and to serve as a pastor. Connecticut is the only home his children have ever known. They have never been to Honduras.

120.     TPS holders are an integral part of the economic and social fabric of American communities, and they give back to this country in countless ways. They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions.[63] They pay federal, state, and local taxes, and support government social welfare programs. Experts estimate that without Honduran TPS holders alone, the U.S. Gross Domestic Product would shrink by at least $31.3 billion.[64]

121.     The net positive economic contributions of TPS holders are not surprising in light of their consistently high employment rate: eighty-five percent of Honduran TPS holders are employed. About seventeen percent are entrepreneurs, creating jobs not just for themselves but also for their communities.[65] About thirty percent of TPS-holder households have mortgages, including 9,500 households with Honduran TPS holders.[66] More than half of Honduran TPS holders have resided in the United States for twenty years or more.[67]

---

[63] CELIA MEJÍVAR, CTR. FOR MIGRATION RES., UNIV. OF KAN., TEMP. PROTECTED STATUS IN THE U.S.: THE EXPERIENCES OF HONDURAN & SALVADORAN IMMIGRANTS 19 (2017).
[64] CTR. FOR AM. PROGRESS, *supra* note 62, at 2.
[65] Warren & Kerwin, *supra* note 55, at 582–83.
[66] CTR. FOR AM. PROGRESS, *supra* note 62, at 2.
[67] Warren & Kerwin, *supra* note 55, at 581.

122.    In light of the overwhelming evidence of the contributions of TPS holders, bipartisan groups of mayors and legislators,[68] business leaders,[69] labor unions,[70] and faith-based leaders[71] recognize the need to maintain the TPS program. To not extend TPS "would harm [U.S.] national security interests by undermining the fragile security in those countries," as well as "negatively impact hundreds of thousands of American children."[72]

## CLASS ALLEGATIONS

123.    Minor Plaintiffs S.S. and G.D.P. bring this action under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2), on behalf of themselves and a nationwide class of all similarly situated persons.

124.    Minor Plaintiffs seek to represent the following nationwide class: U.S.-citizen children, from ages five to eighteen, of all TPS holders from Honduras and Nepal.

---

[68] Letter from Ed Pawlowski, Mayor of Allentown, Penn., et al. to Kirstjen Nielsen, Sec'y of Homeland Sec. (Jan. 3 2018) (letter from 19 U.S. mayors and Cities for Action, a national coalition of more than 175 cities and counties); Letter from Ben Cardin, U.S. Senator, et al. to Rex Tillerson, Sec'y of State, & Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 19, 2017); Letter from James P. McGovern, Member of Congress, et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Sept. 11, 2017) (bipartisan letter from 116 Members of Congress); Letter from Kirsten Gillibrand, U.S. Senator, et al. to Rex Tillerson, Sec'y of State, & John F. Kelly, Sec'y of Homeland Sec. (July 18, 2017) (letter from 26 U.S. Senators).

[69] Letter from Neil L. Bradley, Senior Vice President & Chief Policy Officer, U.S. Chamber of Commerce, to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017); Letter from Embassy Suites Miami Airport, et al. to Marco Rubio, U.S. Senator (Nov. 3, 2017); Letter from Tex. Agric. Irrigation Ass'n, et al. to John Cornyn, U.S. Senator (Nov. 3, 2017).

[70] *See, e.g.*, Press Release, Rachel Gumpert, UNITE HERE!, Labor Unions Launch Nearly One Million Dollar Campaign to Save TPS (Nov. 16, 2017), http://unitehere.org/press-releases/labor-unions-launch-nearly-one-million-dollar-campaign-to-save-tps/; Terry O'Sullivan & Stephen Sandherr, *Trump Immigration Acts Will Hurt Families, Slow Hurricane Recovery*, HOUSTON CHRON. (Feb. 23, 2018) (General President of Laborers' International Union of North America, which represents half a million workers, calls for extension of TPS).

[71] Letter from The Evangelical Immigration Roundtable to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 1, 2017); Letter from Faith Leaders & Faith-Based Organizations to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Sept. 17, 2017) (560 faith leaders and 129 national, state, and local faith-based organizations); Letter from the U.S. Conference of Catholic Bishops Migration and Refugee Services et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017).

[72] Letter from Dick Durbin, U.S. Senator, et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 9, 2017), *available at* https://www.durbin.senate.gov/newsroom/press-releases/lawmakers-call-for-reversal-of-administration-decision-to-expose-thousands-to-dangerous-deportations.

125.     The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1), because it is so numerous that joinder of all members is impracticable.

126.     On information and belief, there are tens of thousands of U.S.-citizen children of TPS holders from Honduras and Nepal. Given the dates of TPS designations for those countries, thousands of those children are minors confronted with the possibility of losing either the ability to live in their native country or the care and support of one or both parents.

127.     Due to the actions of Defendants, unsupported by any legitimate government interest, U.S.-citizen children of TPS holders will be forced to choose between their absolute and fundamental due process right to reside in this country and their due process right to the care and support of their parents.

128.     The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). Members of the class are subject to a common practice or policy: Defendants' adoption of a new standard, unsupported by any legitimate government interest, that has caused the termination of the TPS designations for their parents' respective countries without any consideration of the impact on the class members—*i.e.*, these American children. If the TPS termination decisions take effect, these children will be forced by law to choose between their right to reside in this country as citizens and their right to reside with their parents. Whether the Due Process Clause permits the government to foist this choice upon these minor children presents a common legal question, resolution of which will greatly aid the efficient resolution of this case.

129.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3), because the claims of the Minor Plaintiffs are typical of the claims of their class. Minor Plaintiffs and the proposed class members are Honduran and Nepali TPS holders' school-aged children, from ages five to eighteen, who are U.S. citizens. Their parents will be subject to removal once Defendants' TPS termination decisions take effect. Minor Plaintiffs and their proposed class also share the same legal claims, which challenge the legality of Defendants' termination policies and practices under the Fifth Amendment.

130.     The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Minor Plaintiffs seek the same relief as the other members of the class. In

defending their own rights, Minor Plaintiffs will defend the rights of all proposed class members fairly and adequately.

131.    Additionally, the proposed class is represented by *pro bono* counsel from the National Day Laborer Organizing Network ("NDLON"), the American Civil Liberties Union of Southern California, Asian Americans Advancing Justice – Los Angeles, Asian Americans Advancing Justice – Asian Law Caucus, and Sidley Austin LLP. Plaintiffs' counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of non-citizens.

132.    The members of the class are readily ascertainable through Defendants' records.

133.    Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2). Competing rulings as to whether Defendants must permit the TPS-holding parents of minor U.S.-citizen children to reside in the United States could create inconsistent adjudications and establish incompatible standards of conduct governing Defendants' behavior. In addition, Defendants have acted on grounds that are generally applicable to the class by terminating TPS designations for Honduras and Nepal without considering the massive harm the decisions cause to U.S.-citizen children or providing reasons to justify that harm. Thus, final injunctive and declaratory relief is appropriate for the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of the Administrative Procedure Act

### (Against All Defendants by All TPS-Holder Plaintiffs)

134.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

135.    The Administrative Procedure Act, 5 U.S.C. 551 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704.

136.     Among other things, the APA empowers federal courts to "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). The right of review under the APA includes a right to judicial review of "executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

137.     To engage in procedurally appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position," and show "good reasons for the new policy." *Id.* at 515 (emphasis in original). Agencies may not "depart from a prior policy *sub silentio*." *Id.* The APA requires an agency to provide even "more substantial justification" when "its prior policy has engendered serious reliance interests." *Id.*

138.     Defendants' terminations of the TPS designations for Honduras and Nepal constitute "final agency action for which there is no other adequate remedy in a court" pursuant to 5 U.S.C. 704, because Defendants' termination decisions trigger TPS holders' loss of TPS "automatically and without further notice or right of appeal," 8 C.F.R. 244.19.

139.     Defendants' adoption of a new, drastically narrower interpretation of the TPS statute was arbitrary, capricious, and contrary to law in violation of the APA, because it represents a sudden and unexplained departure from decades of decision-making practices and ordinary procedures. By shifting, without explanation, the decision-governing standard for country designations, Defendants engaged in procedurally flawed decision-making. Further, Defendants changed their policy without accounting for the serious reliance interests that their prior policy had engendered. *Fox Television Stations*, 556 U.S. at 515.

140.     Furthermore, Defendants' conduct was also contrary to law, because Defendants' new and drastically narrower interpretation of the TPS statute is erroneous. The TPS statute does not require the Secretary to consider only those country conditions that are directly related to the events that gave rise to the initial TPS designation. The TPS statute places no such constraints on a TPS decision, as years of prior decisions illustrate. "[I]t is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be

incorrect, the action must be set aside . . . ." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 (9th Cir. 2018).

141.    Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations.

### SECOND CLAIM

### Violation of the Equal Protection Guarantee of the

### Due Process Clause of the Fifth Amendment

### (Against All Defendants by All TPS-Holder Plaintiffs)

142.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

143.    The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that reflects a racially discriminatory intent or purpose. Classifications based on race or national origin are subject to exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern that is unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

144.    Defendants' decisions to terminate the TPS designations for Honduras and Nepal are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin.

145.    Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations.

### THIRD CLAIM

### Violation of the Due Process Clause of the Fifth Amendment

### (Against All Defendants by All TPS-Holder Plaintiffs)

146.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

147.    Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*

*v. Davis*, 533 U.S. 678, 693 (2001). TPS holders are lawfully present in this country. They have significant property and liberty interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of their TPS standing. Plaintiffs' due process entitlement is based on both a property interest conferred by the TPS statute in remaining in the United States so long as their countries of origin are unsafe and a liberty interest based on their right under the TPS statute to live and work in the United States.

148.    The "very essence" of Due Process is the "protection of the individual against arbitrary action." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972). Any deprivation of liberty or property interests must, at the very least, pass a test of rationality. The burden on the government is greater when, as here, the liberty interests at stake derive from well-established and significant reliance interests.

149.    Defendants have not articulated, and cannot establish, any rational basis for reversing course on decades of established TPS policy.

150.    Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of Honduras's and Nepal's TPS designations.

### FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment

### (Against All Defendants by All U.S.-Citizen Children Plaintiffs)

151.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

152.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The guarantee against the deprivation of liberty without due process bars the government from infringing on certain "fundamental" liberty interests, regardless of the procedures involved, unless the action is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

153.    Three such fundamental rights are implicated by Defendants' actions. First, Plaintiffs who are school-aged U.S. citizens have an absolute right to live in the United States. To compel

them to live abroad at any time, let alone in their formative years, would deny them a core aspect of their liberty protected by the Fifth Amendment. *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

154.    Second, for at least so long as these U.S.-citizen Plaintiffs remain minors, they have a fundamental right protected by both the First and Fifth Amendments to live with and be raised by their parents. *E.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); *Board of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987).

155.    Third, Defendants' decisions to end the lawful immigration status of their parents impinges upon the U.S.-citizen Plaintiffs' constitutionally protected liberty interests. These American children have an interest in not being compelled to choose between two alternatives, when each alternative will deprive them of a substantial, constitutionally protected aspect of their liberty. *See United States v. Jackson*, 390 U.S. 570 (1968); *cf. New York v. United States*, 505 U.S. 144, 176 (1992).

156.    In invading these fundamental constitutional rights, Defendants have articulated no substantial government interest. Defendants may not lawfully deprive U.S.-citizen Plaintiffs of these fundamental constitutional rights, as their actions advance no legitimate government interest. *See Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir. 1987) (holding that the government may not interfere in the protected interest of family relations without demonstrating a legitimate interest), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999).

157.    U.S.-citizen Plaintiffs will suffer irreparable injury resulting from the termination of the TPS designations.

## PRAYER FOR RELIEF

Individual Plaintiffs, on behalf of themselves and others similar situated, ask this Court to grant the following relief:

1.    Declare that Defendants' termination of the TPS designations for Honduras and Nepal was unconstitutional under the Due Process Clause of the Fifth Amendment and unlawful under the Administrative Procedure Act;

2.      Vacate Defendants' unlawful termination of the TPS designations for Honduras and Nepal;

3.      Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from implementing or enforcing the decisions to terminate the TPS designations for Honduras and Nepal;

4.      Alternatively, certify this case as a class action lawsuit as proposed herein, appoint Individual Minor Plaintiffs G.D.P. and S.S. as class representatives of their class, and the undersigned counsel as class counsel;

5.      And enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from rescinding the immigration status of those TPS holders who have school-aged U.S.-citizen children for so long as the children remain age five to eighteen;

6.      Grant an award of attorneys' fees and costs; and

7.      Grant any other and further relief that this Court may deem fit and proper.

Dated: February 10, 2019                          Respectfully submitted,

                                                  SIDLEY AUSTIN LLP

                                                  /s/ *Alycia A. Degen**
                                                  Alycia A. Degen
                                                  Sean A. Commons
                                                  Tamika Weerasingha-Cote
                                                  Ava Guo
                                                  Kimberly Leaman
                                                  Tyler Domino
                                                  Jon Dugan

                                                  ACLU FOUNDATION OF SOUTHERN CALIFORNIA

                                                  /s/ *Ahilan T. Arulanantham*
                                                  Ahilan T. Arulanantham
                                                  Zoë N. McKinney

NATIONAL DAY LABORER
ORGANIZING NETWORK

/s/ *Jessica Karp Bansal*
Jessica Karp Bansal
Emilou MacLean

ASIAN AMERICANS ADVANCING
JUSTICE – LOS ANGELES

/s/ *Laboni Hoq*
Laboni Hoq
Christopher Lapinig
Michelle (Minju) Cho

ASIAN AMERICANS ADVANCING
JUSTICE – ASIAN LAW CAUCUS

/s/ *Jingni (Jenny) Zhao*
Jingni (Jenny) Zhao
Winifred Kao


*Attorneys for Plaintiffs*

\* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing